# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>The premises located at 11443 Caern Ave, Tujunga, CA 91042, and any digital devices located thereon | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:24-MJ-2312

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC s 2252 | Sexual Exploitation of Minors; |
| 18 USC s 2252A | Possession/Receipt/Distribution of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

SA Riaan Roberts, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA

Hon. A. Joel Richlin
*Printed name and title*

AUSA: Lindsay M. Bailey, x6875

**<u>ATTACHMENT A</u>**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is the property located at 11443 Caern Ave, Tujunga, CA 91042 ("SUBJECT PREMISES").  The SUBJECT PREMISES is located on the west side of Caern Avenue, South of Dellmont Drive. The SUBJECT PREMISES contains a two-story, single-family residence with a wood-frame construction, greyish color asphalt shingled roof, an attached two-car garage and concrete driveway. The residence is beige stucco with brown roof trim and white garage door. The door to the SUBJECT PREMISES appears brown in color and is located towards the center of the residence. The numeral "11443" is painted on the curb directly in front of the SUBJECT PREMISES.

The search of the SUBJECT PREMISES is limited to the outside of the premises where the item in Attachment B is believed to be located.  Specifically, the area outside the SUBJECT PREMISES adjacent to the garage on the property located at the SUBJECT PREMISES, near a vent on an exterior wall.  The execution of the search warrant provides for law enforcement to dig up and excavate the area as needed to locate the items in Attachment B.

i

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A (the "Subject Offenses"), namely:

a.   A box located on the SUBJECT PREMISES, as described above, as well as its contents, including any digital devices located therein.

b.   Child pornography, as defined in 18 U.S.C. § 2256(8).

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

     e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

     f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

     g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

     h.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

       i.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

       j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

       k.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

       l.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

       m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

       n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

          i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

          ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

          v.  evidence of the times the device was used;

          vi.  applications, programs, software,
documentation, manuals, passwords, keys, and other access
devices that may be necessary to access the device or data
stored on the device, to run software contained on the device,
or to conduct a forensic examination of the device;

          vii. records of or information about Internet
Protocol addresses used by the device.

    2.   As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

    3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as thumb drives, external hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be

seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

6.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**<u>AFFIDAVIT</u>**

I, Riaan Roberts, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Homeland Security Investigations ("HSI") and have been so employed since September 2019.  I am currently assigned to the HSI Ventura office in Northridge, California, which is tasked with investigating child exploitation, child pornography, cybercrimes, immigration crimes, human rights violations and human smuggling, smuggling of narcotics, weapons, and other types of contraband, financial crimes, and export-import enforcement issues.

2.   I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.   I am a graduate of the Federal Law Enforcement Training Center, successfully completing the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training program. Prior to being employed as a Special Agent by HSI, I worked as an Intelligence Analyst for HSI from 2013-2019 and served in the United States Marine Corps from 2004 to 2012.

4.   Through my training and experience, and the shared training and experience of other law enforcement officers experienced in investigating child exploitation crimes with whom I have had discussions, I have become familiar with the methods

used by people who commit human trafficking and child exploitation offenses. My training and experience have given me an understanding of how people who commit offenses relating to child exploitation use digital devices to facilitate and commit those offenses.

## II. PURPOSE OF AFFIDAVIT

5.   This affidavit is made in support of a search warrant for the the premises located at 11443 Caern Ave, Tujunga, CA 91042 ("the SUBJECT PREMISES"), and any digital devices located thereon, as further described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A (collectively, the "Subject Offenses"). Attachments A and B are incorporated herein by reference.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## III. BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

7.   In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

8.   Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

    a.   Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

    b.   File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users

frequently transfer files from one location to another, such as
from a phone to a computer or from cloud storage to an external
hard drive.  Computer users also often create "backup," or
duplicate, copies of their files.  In this way, digital child
pornography is extremely mobile and such digital files are
easily reproduced and transported.  For example, with the click
of a button, images and videos containing child pornography can
be put onto external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied onto
compact disks and/or stored on mobile digital devices, such as
smart phones and tablets.  Furthermore, even if the actual child
pornography files are stored on a "cloud," files stored in this
manner can only be accessed via a digital device.  Therefore,
viewing this child pornography would require a computer,
smartphone, tablet, or some other digital device that allows the
user to access and view files on the Internet.

     c.   The following definitions:

     i.   "Child erotica," as used herein, means
materials or items that are sexually arousing to persons having
a sexual interest in minors but that are not necessarily obscene
or do not necessarily depict minors engaging in sexually
explicit conduct.

     ii.   "Child pornography," as defined in 18 U.S.C.
§ 2256(8), is any visual depiction, including any photograph,
film, video, picture, or computer or computer-generated image or
picture, whether made or produced by electronic, mechanical or
other means, of sexually explicit conduct, where: (a) the

4

production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

iii. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

iv. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in

conjunction with such device" and includes smartphones, other
mobile phones, and other mobile devices. *See* 18 U.S.C.
§ 1030(e)(1).

v.   "Computer hardware," as used herein,
consists of all equipment that can receive, capture, collect,
analyze, create, display, convert, store, conceal, or transmit
electronic, magnetic, or similar computer impulses or data.
Computer hardware includes any data-processing devices
(including central processing units, internal and peripheral
storage devices such as fixed disks, external hard drives,
"thumb," "jump," or "flash" drives, which are small devices that
are plugged into a port on the computer, and other memory
storage devices); peripheral input/output devices (including
keyboards, printers, video display monitors, and related
communications devices such as cables and connections); as well
as any devices, mechanisms, or parts that can be used to
restrict access to computer hardware (including physical keys
and locks).

vi.   "Encryption" is the process of converting
data into a code in order to prevent unauthorized access to the
data.

vii.  "Minor," as defined in 18 U.S.C. § 2256(1),
refers to any person under the age of eighteen years.

viii.   "Mobile applications," as used herein,
are small, specialized programs downloaded onto mobile devices
that enable users to perform a variety of functions, including
engaging in online chats, reading books, or playing games.

ix.  "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

x.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xi.  A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xii. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## IV. **SUMMARY OF PROBABLE CAUSE**

9.  In October of 2023, Zeeshan Hayat Khan (KHAN) was arrested for trafficking 17.70 kilograms of cocaine from Mexico into the United States. At the time of his arrest, KHAN's phone was seized, and a search warrant was subsequently issued for the

phone. Meanwhile, KHAN was released on bond and permitted to return to his primary residence, which he indicated was the SUBJECT PREMISES.

10.  A review of the phone yielded multiple files containing prepubescent Child Sexual Abuse Material (CSAM), as well as images of KHAN engaging in sexually explicit conduct with suspected minor females. The phone also contained records of KHAN communicating with unknown users on messaging applications regarding the transmission of CSAM.

11.  On January 30, 2024, KHAN called a friend to discuss the sale of KHAN's residence, the SUBJECT PREMISES. During the calls, KHAN repeatedly asked the friend to locate a small metallic box containing "a little treasure" buried in the curtilage of the SUBJECT PREMISES.

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  KHAN is Arrested in Southern District of California and Child Sexual Abuse Material is Located on His Phone**

12.  Based on my conversations with HSI agents who are familiar with KHAN and this investigation, I am aware of the following:

a.  On October 2, 2023, at approximately 9:40 AM, Zeeshan Hayat Khan (KHAN) entered the United States from Mexico at the San Ysidro Port of Entry, within the Southern District of California. KHAN was the driver and sole occupant of a silver 2006 Toyota Prius bearing California license plate CZ264DP. Subsequent inspection of the vehicle resulted in the seizure of 15 packages containing approximately 17.70 kilograms of cocaine

concealed in the roof of the vehicle. That same date, KHAN was arrested and charged with violations of 21 U.S.C. §§ 952 and 960 in the Southern District of California.  On October 12, 2023, KHAN was released on a bond and permitted to live in the Central District of California at the SUBJECT PREMISES, which he indicated was his primary residence to the United States Probation and Pretrial Services Office.

b.    As part of the investigation for the above conduct, on October 3, 2023, the Honorable Allison H. Goddard, Magistrate Judge for the Southern District of California, authorized a search and seizure warrant for KHAN's iPhone 13 Pro Max, hereinafter referred to as the Target Device, for violations of 21 U.S.C. §§ 952 and 960.  During an initial review of the Target Device pursuant to this warrant, agents discovered child pornography contained within the Target Device. On November 2, 2023, United States Magistrate Judge Daniel E. Butcher, Magistrate Judge for the Southern District of California, authorized a search and seizure warrant for the Target Device for violations of 18 U.S.C. §§ 2252 and 2252A.  A review of the Target Device yielded multiple files of child pornography, including numerous files of KHAN engaged in sexually explicit conduct with multiple different females later confirmed to be minors.  Additionally, in one video, KHAN is being orally copulated by a female who states that she is fifteen years old.

c.    Contained within the Target Device were also communications between KHAN and unknown users on various

messaging applications, including Kik and Telegram, regarding
the trade, sale, and distribution of child pornography.  Within
the Target Device's Notes application contained a list titled
"PTHC 2020 Collection" that contained over 5,000 links to what
is believed to be child pornography videos.  Although these
links have since been taken down and are no longer accessible by
agents, based on my training and experience and my
communications with other agents who investigate child
exploitation offenses, the title of the note (PTHC) is a
commonly used acronym for "Pre-Teen Hard Core."  Additionally, I
have communicated with other agents experience in investigating
child exploitation cases who are familiar with and previously
viewed child pornography series referenced in the hyperlinks.

     d.   The following is a description of three files
located on the Target Device:

**File Name:** IMG_0908.MP4

**Description:** The file is a video depicting a nude
prepubescent female kneeling on a bed, orally copulating an
adult male's erect penis.  The prepubescent female can be
seen orally copulating and stroking the adult male's penis
with her hands for the duration of the video.

**File Name:** 832F34D5-96A0-41B8-AAEC-08246DC50DA6.MP4

**Description:** The file is a video depicting a prepubescent
female wearing a green shirt and diaper.  An adult male is
standing over the toddler and removes his erect penis from
within his underwear and tells the toddler to "stay put."
The adult male then places his erect penis inside and

around the prepubescent female's mouth for the duration of the video.

**File Name:** IMG_0881.MP4

**Description:** The file is a video depicting a prepubescent female, nude from the waist down.  The prepubescent female is lying on her back with her legs spread open; the camera is focused on the prepubescent female's genitalia.  An adult male's erect penis is seen inserted in the prepubescent female's vagina; the adult male thrusts his erect penis inside the prepubescent female's vagina and anus for the duration of the video.

These three files were among hundreds located on the Target Device.

e.   Following discovery of the child pornography on the Target Device and evidence of KHAN's sexual contact with multiple minor females, Judge Barbara L. Major, United States Magistrate Judge for the Southern District of California, authorized an arrest warrant for KHAN for violations of 18 U.S.C. § 2252(a)(1)— Certain Activities Relating to Material Involving the Sexual Exploitation of Minors (Transportation); KHAN was arrested in the Southern District of California on January 26, 2024, and subsequently booked into the Metropolitan Correctional Center in San Diego, California.

**B.    KHAN Requests Friend to Find and Keep Safe a Box Hidden at the SUBJECT PREMISES**

13.  Based on my conversations with agents who reviewed KHAN's jail calls, my conversation with individuals that were

11

parties to KHAN's phone calls, and my personal investigation into this matter, I know the following:

    a.   On October 26, 2023, HSI agents subpoenaed KHAN's jail calls from the Metropolitan Correctional Center for his period of initial incarceration for 21 U.S.C. §§ 952 and 960.

    b.   On October 5, 2023, KHAN placed a phone call to an individual and instructed the individual to locate KHAN's laptop at the SUBJECT PREMISES.  KHAN provided the individual with his laptop password and asked the individual to retrieve contact information for various people.  KHAN then asked the individual to "clean up" his laptop because "you know, it's pretty dirty."  In a subsequent call on the same day, KHAN asked the same individual to re-access his laptop and log into KHAN's iCloud account.  KHAN informed the individual that he needed to "act fast" on this and to go into the photos and videos and "clean up everything."  KHAN instructed the individual to go into the Hidden folder within the iCloud photos.  Approximately one hour later, KHAN placed another call to the individual and asks if he was able to "delete everything."  The individual said that he was not yet able to, and that KHAN has three thousand and 800 something photographs.  KHAN replied, "yeah, delete everything… Including the videos, and if you can get into the hidden section, delete that too, delete everything."

    c.   On March 25, 2024, HSI agents subpoenaed KHAN's jail calls from Metropolitan Correctional Center for his second period of incarceration.  Upon review, HSI agents learned that on January 30, 2024, KHAN called his friend.  During this call,

they discuss the sale of "my (KHAN's) house."  Based on my
review of recent pictures of the SUBJECT PREMISES, I know that
KHAN currently has a large "for sale" sign outside of the
SUBJECT PREMISES with a picture of a realtor on it.

      d.   KHAN then asked his friend the following: "But
look, there's something I need you to do though, when you get to
the house and get those documents. In the little garden, right,
that's next to the garage, you know that has the big rock and
stuff. So, you know how there's a laundry vent or whatever,
there's a vent and a hose and stuff. I have um a little treasure
right, a little box metal thing under some debris.  I need you
to get that for me and keep it safe. And if you need help
finding it try to get a metal detector or something to look for
it.  It's closer to the garage near the vent.  It's a little
metal box, and I just need you to take it and keep it safe."
KHAN then instructed his friend to clean out the closets and
stated "I don't want feds coming in and saying oh look at this
and look at this. How did he pay for this, how did he pay for
that.  Oh if he had this he must be a bad person you know. I
really don't need that.  I don't want them to fiddle and cut up
things.  I don't know if they're gonna go put out a warrant to
go search my house or not, they shouldn't because there's
nothing at my house, but if they did that's the last thing I
want the new homeowners to see.  But the thing is though, um
when should I confirm that you… especially the little treasure?"
The friend replied that KHAN should give him a call on Thursday

to check in; KHAN stated "Thursday afternoon, OK, because 100% I need you to keep that safe."

      e.   On February 3, 2024, KHAN placed a call to a family member where they discussed getting the SUBJECT PREMISES ready for sale. KHAN told the family member that he told the friend to move some things around for him, put his valuables and his mother's things into storage, and to take his collectibles and keep them safe. KHAN reiterated to his family member that these things need to be done because when he returns after bail the "feds" are going to "come in and do a search, a random search." KHAN asked his family member to contact the friend and confirm that the friend did everything that KHAN had asked.

      f.   Shortly thereafter, KHAN placed another call to the same family member and inquired if the family member had made contact with the friend. The family member stated that he had not contacted KHAN's friend because KHAN's friend needed to go in for medical treatment and had not returned yet. KHAN instructed his family member to send the following text message to the friend on KHAN's behalf: "Zeeshan wants to know if you did the thing that he wanted you to do."

      g.   On February 5, 2024, KHAN placed a call to the same family member and asks if the family member was able to make contact with the friend again, to see if "he did what I requested."

      h.   On February 17, 2024, KHAN placed a call to the friend to discuss various offers he had received for the sale of the SUBJECT PREMISES. KHAN then asked his friend if he was able

to do the things at the SUBJECT PREMISES that KHAN had previously asked. The friend stated: "Yes, so I did everything, I dug up for like 2 feet in the section, I couldn't find your box. I have pictures of it too where I was digging up. It was right next to the garage, to the left of the garage right where the vent is for the washer and dryer," to which KHAN replied, "Well you better find it." The friend stated: "No dude I dug, I put it on my life bro, I was digging I was there for 30 minutes, and then I even almost lost the house key because when I was digging and I was leaning over the house key fell and it fell into like a vent. So I had to get it out with like uh… It was a hassle. This was probably like a week and a half ago, literally like three days after you told me. I went over there I made sure the house was good to go, I had some more cleaners go back to the house. I was digging I even got like two sticks and started digging everywhere and dude I couldn't find it to be honest. I don't know if you hid it really well or…" to which KHAN replied "No, that's why I asked you to bring like a metal detector or something to look for it." KHAN then told the friend that he should go buy a metal detector and KHAN's family member would reimburse the friend for the cost of it. KHAN then reiterated the importance of the "treasure" to him, and that the friend must go back with a metal detector to look for it again. KHAN further described the treasure as a black little metal box, "it's like the size of a thumb, you know."

    i.   Based on the conversation KHAN had with his friend, at approximately 0930 hours on April 12, 2024, I met

with the friend at his place of employment. The friend indicated
he would prefer to speak with agents outside of the business, on
the walkway in front of the building. I presented my
credentials, informed the friend he was free to leave at any
time and that the interview was completely voluntary. The friend
indicated he understood and reiterated he was willing to be
interviewed.

j.   I showed the friend a printout of KHAN's photo
taken from his California Drivers' license and asked him to
confirm if this was the person he knew as Zeeshan KHAN. The
friend confirmed the photo as KHAN and stated he had suspected
KHAN would be the subject of the interview. I asked the friend
about the box KHAN described and the friend confirmed KHAN had
asked him to retrieve it from the residence.

k.   The friend described the location KHAN gave him
for the position of the box. It was to be located under a dirt
patch adjacent to the garage on the property located at the
SUBJECT PREMISES, near a vent on an exterior wall. The friend
said he had tried to retrieve the box but was unable to locate
it, and believed it was still at the SUBJECT PREMISES. The
friend then offered agents his assistance in locating the box,
but his offer of assistance was declined by law enforcement.
The friend stated that KHAN described the box as small and
metallic in nature, and that KHAN recommended the use of a metal
detector in locating it.

14.  Based on this investigation, KHAN's jail calls, and my
training and experience, I believe that KHAN has buried a small

external storage device in the garden at the SUBJECT PREMISES. External structures, such as buildings or garages, and backyards are particular locations of interest where a target, such as KHAN, may conceal such materials from his family members or law-enforcement.  Additionally, a separate external structure, such as an external building or garage, can be used as a backup storage location for such digital devices, and serve as space away from the residence to ensure that one's collection remains safe if anything were to happen to KHAN's primary collection. Based on the statements made in KHAN's jail calls, I also believe that there is probable cause to believe that evidence of the Subject Offenses will be located on a digital storage device located in the box at the SUBJECT PREMISES.

## VI.  TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

15.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.  Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in

photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices, including external storage devices, in their homes, in their cars, in their workplaces, or on their persons.

b.    Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

c.    Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities at the SUBJECT PREMISES.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable

after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

16.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

17.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

        a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

18.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.       CONCLUSION

19.  For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A will be found in a search of the SUBJECT PREMISES, as described in Attachment A. The warrant seeks authorization to unearth, seize, and search

the physical contents of a box, and any digital devices found

therein, as described in Attachment B.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
April, 2024.


_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE